# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 24-40315

SPACE EXPLORATION TECHNOLOGIES, CORPORATION,

*Plaintiff-Appellant,*

v.

NATIONAL LABOR RELATIONS BOARD, a Federal Administrative Agency; JENNIFER ABRUZZO, in her Official Capacity as the General Counsel of the National Labor Relations Board; LAUREN M. MCFERRAN, in her Official Capacity as the Chairman of the National Labor Relations Board; MARVIN E. KAPLAN, in his Official Capacity as a Board Member of the National Labor Relations Board; GWYNNE A. WILCOX, in her Official Capacity as a Board Member of the National Labor Relations Board; DAVID M. PROUTY, in his Official Capacity as a Board Member of the National Labor Relations Board; JOHN DOE, in his Official Capacity as an Administrative Law Judge of the National Labor Relations Board,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, NO. 1:24-cv-00001,
JUDGE JOSE ROLANDO OLVERA

---

**BRIEF OF FORMER ATTORNEY GENERAL EDWIN MEESE III,
LAW PROFESSORS STEVEN G. CALABRESI AND GARY S. LAWSON,
AND THE LANDMARK LEGAL FOUNDATION AS *AMICI CURIAE*
SUPPORTING APPELLANT AND REVERSAL**

---

AMIT R. VORA
KASOWITZ BENSON TORRES LLP
*Attorney for Amici Curiae*
1633 Broadway
New York, New York 10019
(212) 506-1834
avora@kasowitz.com

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

In addition to the interested parties listed in Plaintiff-Appellant's certificate of interested persons, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of this Court's Rule 28.2.1 have an interest in the outcome of this case. These supplemental disclosures are made pursuant to this Court's Rules 28.2.1 and 29.2 in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Edwin Meese III, *Amicus Curiae* for the Plaintiff–Appellant.

2. Steven G. Calabresi, *Amicus Curiae* for the Plaintiff–Appellant.

3. Gary S. Lawson, *Amicus Curiae* for the Plaintiff–Appellant.

4. Landmark Legal Foundation, *Amicus Curiae* for the Plaintiff–Appellant.

5. Amit R. Vora of Kasowitz Benson Torres LLP, Counsel for *Amici Curiae*.

Dated: July 24, 2024

/s/ Amit R. Vora

Amit R. Vora
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.: 212.506.1834
avora@kasowitz.com

*Counsel for Amici*

**CORPORATE DISCLOSURE STATEMENT**

Landmark Legal Foundation, a nonprofit corporation, states that it has no parent companies, subsidiaries, or affiliates that have issued shares to the public, and no publicly held company has 10% or greater ownership in it.

Dated: July 24, 2024                       /s/ Amit R. Vora

<div style="margin-left:40%;">

Amit R. Vora
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.: 212.506.1834
avora@kasowitz.com

*Counsel for Amici*

</div>

# TABLE OF CONTENTS

Page

INTEREST OF THE AMICI.......................................................................1

SUMMARY OF ARGUMENT.................................................................. 2

ARGUMENT.............................................................................................3

    I.    THE NLRB'S NOVEL *THRYV* REMEDY TRIGGERS THE
        SEVENTH AMENDMENT RIGHT TO CIVIL JURY TRIAL........3

        A.    THE RIGHT'S ORIGINS AND HISTORICAL IMPORTANCE..............3

        B.    THE SEVENTH AMENDMENT REQUIRES A JURY IN
               DAMAGES ACTIONS................................................................10

        C.    THE *THRYV* REMEDY IS A DAMAGES REMEDY.......................... 11

    II.    THE NLRB'S REMEDIES REQUIRE AN
         ARTICLE III COURT. .....................................................................14

    III.    THE NLRB'S REMEDIES DO NOT IMPLICATE THE
          PUBLIC-RIGHTS EXCEPTION.....................................................16

CONCLUSION.......................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
  598 U.S. 175 (2023)........................................................ 15

*Big Time Vapes, Inc. v. Food & Drug Admin.,*
  963 F.3d 436 (5th Cir. 2020) ......................................... 1

*Central Hardware Co. v. NLRB,*
  407 U.S. 539 (1972)........................................................ 16

*Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry,*
  494 U.S. 558 (1990) ....................................................... 13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010)........................................................ 19

*Georgia v. Brailsford,*
  3 Dall. 1 (1794) ............................................................. 11

*Hudgens v. NLRB,*
  424 U.S. 507 (1976)........................................................ 16

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. AFL-CIO, Loc. 283 v. Scofield,*
  382 U.S. 205 (1965)........................................................ 16

*Mertens v. Hewitt Assocs.,*
  508 U.S. 248 (1993) .................................................12, 13

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
  53 F.4th 869 (5th Cir. 2022)........................................... 1

*NLRB v. Jones & Laughlin Steel Corp.,*
  301 U.S. 1 (1937) ........................................................... 14

*NLRB v. Robbins Tire & Rubber Co.,*
  161 F.2d 798 (5th Cir. 1947) (Waller, J., concurring) ....................................... 16

*Sec. & Exch. Comm'n v. Jarkesy*,
144 S. Ct. 2117 (2024) ................................................................*passim*

*Thryv, Inc.*,
372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022)............................*passim*

*Thryv, Inc. v. NLRB*,
102 F.4th 727 (5th Cir. 2024)........................................................... 14

*Wolgast Corp. v. NLRB*,
349 F.3d 250 (6th Cir. 2003) ........................................................... 16

**Constitutional Amendments**

U.S. Const. amend. VII ..................................................................*passim*

U.S. Const. amend. XIV ......................................................................3

**Statutes**

An Act to Establish the Judicial Courts of the United States § 9, 1 Stat.
73 (1789) .......................................................................................6

29 U.S.C. §§ 151–69 .......................................................................... 13

**Rules**

Fed. R. App. P. 29(a) .........................................................................2

**Other Authorities**

Answers to Mr. Mason's Objections to the New Constitution, *in*
Pamphlets on the Constitution The United States (P. Ford ed.
1968).............................................................................................10

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State
Constitutions When the Fourteenth Amendment Was Ratified in 1868:
What Rights Are Deeply Rooted in American History and Tradition?*,
87 Tex. L. Rev. 7 (2008) ....................................................................3

Steven G. Calabresi, Sarah E. Agudo, & Kathryn L. Dore, *State Bills of
Rights in 1787 and 1791: What Individual Rights Are Really Deeply*

*Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451 (2012) ................................................................. 3

Steven G. Calabresi, James Lindgren, Hanna M. Begley, Kathryn L. Dore & Sarah E. Agudo, *Individual Rights Under State Constitutions in 2018: What Rights Are Deeply Rooted in a Modern-Day Consensus of the States*, 94 Notre Dame L. Rev. 49 (2018) .................... 4

The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed. 1891) ................. 8

The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed. 1836) ................. 9

The Declaration of Independence, 1776 .................................. 5

Gary S. Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231 (1994) ............................................. 19

Letter from a Democratic Federalist (Oct. 17, 1787), *in* The Founders' Constitution 354 (P. Kurland & Ralph Lerner eds. 1987). ............ 8

Letter from the Federal Farmer, No. 4 (Oct. 12, 1787), *in* The Complete Anti-Federalist (Herbert J. Storing ed. 1981). .............. 9

Letter from a New Hampshire Farmer, No. 3 (June 6, 1788), *in* The Complete Bill of Rights (N. Cogan ed. 1997) ........................ 6

Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639 (1973) ............................. 3

## INTEREST OF THE AMICI

The Honorable Edwin Meese III served as the seventy-fifth Attorney General of the United States. Previously, Mr. Meese was Counselor to the President. He is now the Ronald Reagan Distinguished Fellow Emeritus at the Heritage Foundation. During his tenure as Attorney General, the Department of Justice defended proper limits on federal power.

Steven G. Calabresi is the Clayton J. & Henry R. Barber Professor of Law at Northwestern Pritzker School of Law, and Gary S. Lawson is the Levin, Mabie & Levin Professor at the University of Florida Levin College of Law. They are scholars of the Constitution's original public meaning. Judges on this Court have cited their work. *See, e.g.*, *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 n.19 (5th Cir. 2022) (citing Calabresi); *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 442 n.15 (5th Cir. 2020) (citing Lawson).

Landmark Legal Foundation is a national public-interest law firm committed to preserving the principles of limited government, separation of powers, federalism, originalist construction of the Constitution, and individual rights.

*Amici* submit this brief to assist this Court in interpreting the original public meaning of the Seventh Amendment, especially as it relates to the novel remedies that the National Labor Relations Board ("NLRB") has been pursuing.

*Amici* file this brief under Federal Rule of Appellate Procedure 29(a). Counsel for all parties have been notified of and have consented to the brief's filing. No party's counsel authored this brief, no party or its counsel contributed money to prepare the brief, and no person other than *amici*, its members, or its counsel contributed money intended to fund the preparation or submission of the brief.

## SUMMARY OF ARGUMENT

Of ancient vintage, the right to trial by jury has long been considered the most essential individual protection against arbitrary and oppressive expressions of centralized governmental power. The right is premised on the stirringly republican insight that, with some exceptions, only a group of everyday peers—not a monarch, not a judge, and not a bureaucrat—is equipped to decide facts that might condemn a private citizen to liability or guilt.

Plainly, the NLRB's novel *Thryv* remedy should trigger the Seventh Amendment right to civil jury trial. No matter what label the NLRB might give it, the *Thryv* remedy *is* a remedy for money damages, which—as "the prototypical common law remedy"—falls squarely within the Seventh Amendment's scope. *See Sec. & Exch. Comm'n v. Jarkesy*, 144 S. Ct. 2117, 2129 (2024). And even if the NLRB's traditional, equitable remedies do not necessitate civil juries, the NLRB may not adjudicate cases and controversies that concern core private rights without

affording respondents an Article III forum. *See id.* at 2143 (Gorsuch, J., concurring).

## ARGUMENT

I. **The NLRB's Novel *Thryv* Remedy Triggers the Seventh Amendment Right to Civil Jury Trial.**

   A. **The Right's Origins and Historical Importance.**

The most deeply rooted right in American history and tradition is the right to trial by jury. All twelve States that wrote constitutions and bills of rights between 1776 and 1791 protected the right to civil jury trial. Steven G. Calabresi, Sarah E. Agudo, & Kathryn L. Dore, *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1511–12 (2012). Although Rhode Island and Connecticut stayed with their colonial charters and therefore did not generate bills of rights, they honored jury trial rights as a matter of common law. Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 655 (1973). The right to civil and criminal jury trial was guaranteed by 36 out of 37 States in 1868, the year the Fourteenth Amendment was ratified. Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 76–77 (2008). Today, the right to civil jury trial is guaranteed in every State except Louisiana. Steven G. Calabresi, James Lindgren, Hanna M.

Begley, Kathryn L. Dore & Sarah E. Agudo, *Individual Rights Under State Constitutions in 2018: What Rights Are Deeply Rooted in a Modern-Day Consensus of the States*, 94 Notre Dame L. Rev. 49, 111–16 (2018).

The idea of the civil jury—as intuitive as it is brilliant—has ancient origins. Sir William Blackstone extolled the right's virtues, deeming it "ever esteemed, in all countries, a privilege of the highest and most beneficial nature," "the best criterion, for investigating the truth of facts, that was ever established in any country," and "so valued by the people, that no conquest, no change of government, could ever prevail to abolish it." 3 William Blackstone, Commentaries *350, 385.

Notably for our purposes, Blackstone understood that the right was a powerful bulwark against power grabs by all types of governmental adjudicatory bodies:

> A competent number of sensible and upright jurymen, chosen by lot from the middle rank, will be found the best investigators of truth and the surest guardian of public justice. … This therefore preserves in the hands of the people that share which they ought to have in the administration of public justice, and presents the encroachments of the more powerful and wealthy citizens. Every new tribunal, erected for the decision of facts without the intervention of a jury (whether composed of justices of the peace, commissioners of the revenue, judges of a court of conscience, or any other standing magistrates), is a step towards establishing aristocracy, the most oppressive of absolute governments.

*Id.* at *380.

Blackstone claimed that the jury trial had been used "time out of mind" in England, *see id.* at *349, and whether or not he was correct as a matter of history, his

views inspired founding-era attitudes, *see* Wolfram, *supra*, at 653 n.44 ("The framers all seem to have agreed that trial by jury could be traced back in an unbroken line to … Magna Charta."). The colonists and founders of our fledgling nation adopted the venerable English view. They, too, recognized the wisdom in securing the right to jury trial—not only for criminal cases, but also for civil suits at common law.

As Justice Gorsuch recently recounted in his concurrence in *Jarkesy*, "in the decade before the Revolution, the drip, drip, drip of expanding power became a torrent, as Parliament allowed more and more actions to be brought in colonial vice-admiralty courts"—*i.e.,* tribunals that "lacked juries," that "lacked truly independent judges," and where colonial administrators "thought they would win more often." *Jarkesy*, 144 S. Ct. at 2142–43 (Gorsuch, J., concurring). Consequently, the Declaration of Independence complained in 1776 of "pretended Legislation … depriving us in many cases of the benefit of Trial by Jury." The Declaration of Independence ¶ 20, 1 Stat. 1, 2.

After independence, "[i]n all of the thirteen original states formed after the outbreak of hostilities with England, the institution of civil jury trial was continued, either by express provision in a state constitution, by statute, or by continuation of the practices that had applied prior to the break with England." Wolfram, *supra*, at 655. The Continental Congress in the Ordinance for the Northwest Territory

ensured that "inhabitants of the said territory shall always be entitled to the benefits of … the trial by jury." An Ordinance for the Government of the Territory of the United States North-West of the River Ohio, art. II (1787). And the Judiciary Act of 1789 afforded jury trials in "all suits at common law in which the United States sue." An Act to Establish the Judicial Courts of the United States § 9, 1 Stat. 73, 77 (1789).

The civil jury-trial guarantee's absence from the Constitution was among the Antifederalists' chief objections. They concurred with Blackstone that the right was a critical check on abuses of power by tribunals of all stripes. To illustrate, the pseudonymous New Hampshire Farmer enthusiastically endorsed Blackstone's observation that "every new tribunal erected for the decision of facts, without the intervention of a jury … is a step towards establishing aristocracy." Letter from a New Hampshire Farmer, No. 3 (June 6, 1788), *in* The Complete Bill of Rights 477 (N. Cogan ed. 1997) (quoting 3 William Blackstone, Commentaries *380). Similarly, the pseudonymous Farmer proclaimed that juries were of paramount importance for curbing the power of corrupt judges, "who may easily disguise law, by suppressing and varying fact," and stopping a backslide into "despotism":

> Destroy juries and every thing is prostrated to judges, who may easily disguise law, by suppressing and varying fact: — Whenever therefore the trial by juries has been abolished, the liberties of the people were soon lost — The judiciary power is immediately absorbed, or placed under the direction of the executive, as example teaches in most of the States of Europe. … Give them power and they will find understanding to us it — But taking juries with all their real and

attributed defects, it is not better to submit a cause to an impartial tribunal, who would at least, as soon do you right as wrong — than for every man to become subservient to government and those in power? — Would any man oppose government, where his property would be wholly at the mercy and decision of those that govern? — We know the influence that property has over the minds of men — they will risque their lives rather than their property; and a government, where there is no trial by jury, has an unlimited command over every man who has any thing to loose [sic]. — It is by the attacks on private property through the judiciary, that despotism becomes as irresistible as terrible . . . These dreadful examples may teach us the importance of juries in civil cases — they may recal [sic] to my countrymen a maxim which their ancestors, as wise, and more virtuous than their posterity, held ever in view.

Essays by A Farmer, Md. Gazette (March 21, 1788), *in* 5 The Complete Anti-Federalist 36, 37–40 (Herbert J. Storing ed. 1981). If the Antifederalists were so concerned with the political whims of judges, it stands to reason that they would not have tolerated the modern-day notion of a politically driven administrative adjudicator who is housed within the very agency that brings the charge.

The Antifederalists understood that the civil jury was an especially vital shield of liberty in a particular context: suits between private citizens and the federal government. The pseudonymous Democratic Federalist warned of possible abuses by military officers, "excise or revenue officers," or constables:

[I]n such cases a trial by jury would be our safest resource, heavy damages would at once punish the offender, and deter others from committing the same: but what satisfaction can we expect from a lordly court of justice, always ready to protect the officers of government against the weak and helpless citizen, and who will perhaps sit at the distance of many hundred miles from the place where the outrage was committed?—What refuge shall we then have to shelter us from the iron hand of arbitrary power?—O! my fellow citizens,

think of this while it is yet time, and never consent to part with the glorious privilege of trial by jury, but with your lives.

Letter from a Democratic Federalist (Oct. 17, 1787), *in* 5 The Founders' Constitution 354 (P. Kurland & Ralph Lerner eds. 1987). The letter's reference to "excise or revenue officers" reveals that civil cases between citizens and the federal government were at the forefront of the writer's mind. James Monroe echoed that concern at the Virginia ratifying convention, where he expressed concern about the possible loss of jury trials in tax disputes with the federal government. *See* 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 218 (Jonathan Elliot ed. 1891).

The Antifederalists also understood that the civil jury-trial guarantee was, at its core, a republican ideal. The jury was to the judicial branch what the House of Representatives was to the legislative branch:

> The trial by jury is very important in another point of view. It is essential in every free country, that common people should have a part and share of influence, in the judicial as well as in the legislative department. To hold open to them the offices of senators, judges, and offices to fill which an expensive education is required, cannot answer any valuable purposes for them; they are not in a situation to be brought forward and fill those offices … . The few, the well-born, etc. as Mr. Adams calls them, in judicial decisions as well as in legislation, are generally disposed, and very naturally too, to favour those of their own description.

> The trial by jury in the judicial department, and the collection of the people by their representatives in the legislature, are those fortunate inventions which have procured for them, in this country, their true proportion of influence, and

the wisest and most fit means of protecting themselves in the community. Letter from the Federal Farmer, No. 4 (Oct. 12, 1787), *in* 2 The Complete Anti-Federalist 249–50 (Herbert J. Storing ed. 1981).

In the Philadelphia ratifying convention debates, James Wilson insisted that the original Constitution's failure to secure the right to civil jury trial did not preclude Congress from affording that right by statute. Wilson further denied that Article III's reference to the courts' jurisdiction over facts signaled that the framers were seeking to abolish the civil jury trial or shoehorn the detested Roman legal tradition into the American experiment. 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 488–89, 515–19 (Jonathan Elliot ed. 1836). James Iredell and Alexander Hamilton agreed that the Constitution's omission was not an exclusion. Marcus, Answers to Mr. Mason's Objections to the New Constitution, *in* Pamphlets on the Constitution of The United States 361–62 (P. Ford ed. 1968); The Federalist No. 83 (Alexander Hamilton) (urging that the Constitution's silence on the civil jury-trial guarantee meant only that "the institution [would] remain precisely in the same situation in which it is placed by the State constitutions").

The original Constitution was ratified only because the Federalists promised that the omission of a civil jury-trial guarantee from the text did not support an

*expressio-unius* inference. When James Madison set out to secure the right to civil jury trial in the Seventh Amendment, the foregoing substantive notions about the right's nature were woven into the tapestry of the guarantee.

**B.     The Seventh Amendment Requires a Jury in Damages Actions.**

The opposition to the absence of a civil jury-trial guarantee, which numerous States voiced in calls for amendments to the new Constitution, spawned the Seventh Amendment:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

In the aftermath of the Seventh Amendment's adoption, the founders' esteem for civil juries did not wane. President Jefferson observed that juries were better equipped than judges to decide "questions of fact": "In the form of juries therefore they determine all matters of fact, leaving to the permanent judges to decide the law resulting from those facts." Thomas Jefferson to the Abbé Arnoux (July 19, 1789), Papers 15: 282-83. And Chief Justice John Jay, in charging a jury, declared:

> It may not be amiss, here, gentlemen, to remind you of the good old rule that on questions of fact, it is the province of the jury, on questions of law it is the province of the court, to decide. … [I]t is presumed that juries are the best judges of facts … .

*Georgia v. Brailsford*, 3 Dall. 1 (1794).

Nothing in the Seventh Amendment excludes common-law suits involving the United States. And a suit for damages is a "Suit[] at common law" that falls squarely within the amendment. The Supreme Court's recent decision in *Jarkesy* confirms this interpretation. Writing for the majority, Chief Justice Roberts explained that, to determine whether a civil suit triggers the Seventh Amendment jury trial right, the first inquiry is whether the suit is "legal in nature," which requires considering whether the cause of action resembles common-law causes of action. 144 S. Ct. at 2129. The second inquiry is whether the remedy is the sort that was traditionally obtained in a court of law. *Id.*

Of particular relevance here, *Jarkesy* confirmed: "While monetary relief can be legal or equitable, money damages are the prototypical common law remedy." *Id.* (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)).

### C.     The *Thryv* Remedy Is a Damages Remedy.

In *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951, at *1 (Dec. 13, 2022), the NLRB concluded as follows:

> [T]o best effectuate the purposes of the Act, our make-whole remedy shall expressly order respondents to compensate affected employees for all direct or foreseeable pecuniary harms that these employees suffer as a result of the respondent's unfair labor practice.

This remedy is broad. *See id.* at *14–15 (stating that the compensation in *Thryv* could

include not only "backpay," but also "interest and late fees on credit cards" and other "credit card debt," "penalties" based on "early withdrawals" from a "retirement account" to "cover living expenses," compensation for loss of a "car" or "home" based on an inability "to make loan or mortgage payments" or "rent," "increased transportation or childcare costs," and "other costs" to "make ends meet"). The NLRB claims that this "make-whole remedy is not 'consequential damages' as that term is used in other areas of the law," and that its new remedy does not "implicate Seventh Amendment concerns." *Id.* at *16.

Yet this provision for monetary relief *is* a consequential-damages remedy, and it *is* legal in nature, not equitable. *Jarkesy* cited *Mertens*, which held: "Although they often dance around the word, what petitioners in fact seek is nothing other than compensatory damages—monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties. Money damages are, of course, the classic form of legal relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993). So too here, the NLRB cannot dance around the term "money damages" to avoid triggering the Seventh Amendment jury trial right.

The *Thryv* remedy appears designed not to restore the status quo or return wrongfully held funds, but rather to target "the wrong done the individual employee," *see Chauffeurs, Teamsters & Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558,

573 (1990) (holding that an employee's duty of fair representation claim against union triggered jury trial right because the money-damages remedy targeted "the wrong done the individual employee," unlike traditional NLRB remedies "which are concerned primarily with the public interest in effecting federal labor policy").

Judge Oldham of this Court has called the *Thryv* remedy what it is: money damages. In late May 2024, this Court vacated the NLRB's order in *Thryv*, holding that the employer's actions did not violate the NLRA. So, this Court had no occasion to opine on the constitutionality of the *Thyrv* remedy. Judge Oldham, however, made the following observation for the unanimous panel: "Moreover, [the NLRB] ordered Thryv to make the [subject employees] whole for all the losses incurred as a direct or foreseeable result of the layoffs—a novel, consequential-damages-like labor law remedy." *Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024).

In the *Thryv* Board decision itself, two of the five Board members dissented. While the dissenters agreed that the NLRB could lawfully compensate employees for "direct" harms, they observed that compensation for "foreseeable" harms "opens the door to awards of speculative damages that go beyond the Board's remedial authority," and could implicate "potential Seventh Amendment issues if [the Board] strays into areas more akin to tort remedies." *Thryv*, 2022 WL 17974951, at *25 (Members Kaplan and Ring, dissenting).

More fundamentally, even if the Supreme Court perfunctorily approved the NLRB's design in 1937, *see NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 47 (1937), that does not mean that the current iteration of the NLRB, including the *Thryv* remedy, passes constitutional muster.

If the NLRB argues, as anticipated, that *Jarkesy* supports its use of this remedy, that argument would be unavailing. The NLRB may attempt to seize on *Jarkesy*'s discussion of civil penalties. But that discussion merely stands for the proposition that a money-damages remedy that functions as a penalty to punish culpable conduct is *sufficient*, but not *necessary*, to fall into the category of a remedy at law and thus trigger the Seventh Amendment jury trial right. The civil penalty at issue in *Jarkesy* is not the only type of money-damages remedy that falls into the category. So, whether or not the *Thryv* remedy amounts to a penalty to punish culpable conduct, it still targets the wrong done to the individual employee, which triggers the Seventh Amendment protection.

## II.     The NLRB's Remedies Require an Article III Court.

Even if some of the NLRB's remedies are equitable and thus do not require a jury trial, they all require an Article III court. As Justice Gorsuch explained in his concurrence in *Jarkesy*, through Article III, "the Constitution provided that 'the judicial Power'—the power over 'Cases' and 'Controversies'—would lie with life-

tenured, salary-protected judges." *Jarkesy*, 144 S. Ct. at 2143 (Gorsuch, J., concurring). Further, as Justice Thomas explained in his concurrence in *Axon*, "[d]isposition of private rights to life, liberty, and property was understood to fall within the core of the judicial power," and "such rights could be adjudicated and divested only by Article III courts." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 203, (2023) (Thomas, J., concurring) (citations and punctuation omitted).

Under Article III, the NLRB may not adjudicate cases and controversies without affording respondents an Article III forum. Indeed, the Supreme Court and other appellate courts have held that the "task of the Board, subject to review by the courts, is to resolve conflicts between" the statutory representation rights of employees and "private property rights 'and to seek a proper accommodation between the two.'" *Hudgens v. NLRB*, 424 U.S. 507, 521 (1976) (quoting *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543 (1972)); *accord Wolgast Corp. v. NLRB*, 349 F.3d 250, 253 (6th Cir. 2003) (recognizing the same); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. AFL-CIO, Loc. 283 v. Scofield*, 382 U.S. 205, 221 n.18 (1965) (noting that the Board is "an organ for adjudicating private disputes"); *NLRB v. Robbins Tire & Rubber Co.*, 161 F.2d 798, 803 (5th Cir. 1947) (Waller, J., concurring) (recognizing that the Board's orders "involve the personal and property rights of citizens").

## III. The NLRB's Remedies Do Not Implicate the Public-Rights Exception.

Notwithstanding the Seventh Amendment's text and history, in *Atlas Roofing*, Justice White posited that rights for workers that the Occupational Safety and Health Review Commission ("OSHA") had created were new public-rights rather than old common-law rights, and that actions concerning such new post-1789 public rights were not "Suits at common law" subject to the Seventh Amendment's civil jury-trial guarantee. *Atlas Roofing Co., Inc. v. OSHA*, 430 U.S. 442, 450 (1977).

*Jarkesy* has wisely narrowed this purported public-rights exception. As Chief Justice Roberts explained, the public-rights exception is a "narrow" category where Congress may assign matters to an agency without a jury, such as matters concerning "the collection of revenue," "tariffs," "relations with Indian tribes," "the administration of public lands," and "the granting of public benefits." 144 S. Ct. at 2132-34. Accordingly, in the majority's view, the SEC's suit did not qualify for the public-rights exception: it was "in the nature of an action at common law" and "presumptively concerned private rights," which made an Article III court "mandatory." *Id.* at 2132. The statutory regime's novelty is no matter, provided that the suit at issue is akin to a suit at common law. *Id.* at 2139.

*Atlas Roofing* was wrongly decided the day it was issued. To be sure, a lower court cannot under-rule the Supreme Court. But *Atlas Roofing* is so fundamentally

mistaken that every effort should be made to distinguish it where doing so would be consistent with the judicial role.

*First*, the framers understood that the common law and statutory law had evolved over centuries and that, from time to time, new common-law or statutory rights could and would emerge. It never would have occurred to them that a right's mere novelty—its mere sheen of "newness"—could repel the civil jury-trial guarantee. Just because Congress creates new causes of action does not mean that federal agencies can both charge and adjudicate those new causes of action themselves—donning the cap of both prosecutor and judge, and dispensing with the ancient right to civil jury trial.

*Second*, the tort-like rights that OSHA created, or the NLRB's powers to adjudicate private rights, fit quite comfortably within the definition of "Case[s] in Law," which the Article III courts have jurisdiction to hear. Such cases are subject to the Seventh Amendment caveat that persons whom the United States sues retain their Seventh Amendment right to civil jury trial on all questions of fact. That principle applies more obviously to this case than to *Atlas Roofing*, but it should have applied to *Atlas Roofing* as well. New public rights have emerged—like the right to social security benefits, Medicaid and Medicare benefits, and veterans' benefits— and access to those rights can be adjudicated in Article I tribunals staffed by ALJs.

But the tort-like rights that OSHA created, or the NLRB's power to adjudicate private rights, are not examples of the new public rights.

*Third*, *Atlas Roofing* overlooks the historical fact that the Seventh Amendment is so intolerant of fact-finding outside a jury that it overrules part of Article III on the power of federal judges to find facts. Article III, Section 2, paragraph 2, sentence 2 provided: "In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make." The Antifederalists were concerned that this clause stripped juries of their fact-finding sovereignty and transferred it to Article III judges. In response, the Seventh Amendment not only preserves the right to civil jury at common law, but it also provides: "no fact tried by a jury, shall be otherwise examined in any Court of the United States, than according to the rules of the common law." The framers trusted lay people to find facts—not life-tenured federal judges, and *a fortiori* not federal bureaucrats.

*Fourth*, and finally, *Atlas Roofing* disregards the commonsense principle that the need for the civil jury-trial protection is *greater* when the federal government brings a lawsuit than when a private person does. Indeed, the rapid rise of the federal administrative state throws the importance of the civil jury-trial right into stark relief. "The growth of the Executive Branch, which now wields vast power and touches

almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010); *see also* Gary S. Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231, 1233 (1994) ("The modern administrative state openly flouts almost every important structural precept of the American constitutional order."). Chief Justice Roberts made that observation in 2010, and since then, the administrative state has only continued to grow, and administrative agencies have become only more aggressive—as the NLRB's pursuit of the *Thryv* remedy reflects. Holding the line, and remaining committed to the ancient right to civil jury trial—a bedrock premise of our government—is essential to keep the administrative state at bay and our liberty intact.

## CONCLUSION

This Court should reverse the district court's effective denial of the preliminary injunction.

Dated: July 24, 2024

/s/ Amit R. Vora

Amit R. Vora
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.: 212.506.1834
avora@kasowitz.com

*Counsel for Amici*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2024, I caused the foregoing *amici curiae* brief to be filed with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit. The Court's CM/ECF system was used to file the brief, and service will thus be accomplished by the CM/ECF system on all CM/ECF registered counsel.

/s/ Amit R. Vora

Amit R. Vora
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.: 212.506.1834
avora@kasowitz.com

*Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains **4,696 words**, excluding those portions of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point **Equity A font**.

Dated: July 24, 2024

/s/ Amit R. Vora

Amit R. Vora
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Tel.: 212.506.1834
avora@kasowitz.com

*Counsel for Amici*